

Law Offices of
# LEONARD W. MOEN & ASSOCIATES

**Founder**
Leonard W. Moen
( 1941 - 1986 )

**Attorneys**

**Ruth A. Moen**
Kathy Majnarich
Carol Farr
James H. Burnett
Susan J. Holm

November 18, 2010

U.S. Court of Appeals for the Ninth Circuit
Judge Richard A. Paez
Judge Kim McLane Wardlaw
Judge Norman R. Smith
95 Seventh Street
Po Box 193939
San Francisco, CA 94119-3939

Re:     Kathie Costanich v. DSHS-APS, et. al, # 08-35217, 08-35287
        Oral Argument:  May 6th, 2009, Seattle

SUPPLEMENTAL AUTHORITY

Dear Court of Appeals:

Appellant Kathie Costanich submits supplemental authority from the Washington Supreme Court, a new decision highly relevant to the Costanich case.

In *Jones v. State*, the Washington Supreme Court held that it was error to dismiss on summary judgment Jones' §1983 suit against state pharmacy investigators whose allegedly fabricated report led to the loss of his pharmacist license. **Jones v. State, No. 80787-6, decided November 4, 2010, attached.**

As the *Jones* court clarified, the state Pharmacy Board's inspectors were not entitled to qualified immunity from liability under 42 U.S.C. § 1983 on summary judgment. There is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity. This due process right applies "*with equal force in a civil proceeding, such as the administrative adjudication in this case, because a pharmacist's professional and business licenses are property interests protected by the due process clause.*" *Ibid.,* ____. There was a genuine issue of material fact concerning whether state inspectors caused a violation of Jones' due process right to be free from summary proceedings based on a fabricated report. Their conduct, when viewed favorably to Jones as the party opposing summary judgment, was unreasonable in light of clearly established law. As the Jones Court noted:

> "*[I]f any concept is fundamental to our American system of justice,
> it is that those charged with upholding the law are prohibited
> from deliberately fabricating evidence and framing individuals.*"

*Ibid.,* ____

947 Powell Ave SW
Suite 105
Renton, Washington
98057-2975

P  (425) 227-4260

F  (425) 227-5140

Web:  www.leonardmoen.com

Law Offices of
**LEONARD W. MOEN & ASSOCIATES**

November 18, 2010
Page 2

     *Jones* is on point with the Costanich case here.   Kathie Costanich sued social-workers from DSHS for allegedly fabricating reports which led to the loss of her foster care license.   In support of her suit, she provided admissions from defendants that they had fabricated reports, and the Washington Court of Appeals opinion that found the DSHS/CPS investigator had fabricated interviews, among other things. *Costanich v. Dep't of Soc & Health Servs*., 138 Wash.App. 547, 156 P.3d 232 (2007).   The district court's dismissal of Ms. Costanich's §1983 suit on summary judgment, with findings that the state social workers had been merely careless, and granting them all qualified immunity, is clearly error under *Jones*.

Respectfully submitted this November 18, 2010

_____/s/_____
Carol Farr, WSBA # 27470
Attorney for Plaintiff Kathie Costanich

Attachment:   Jones v. State of Washington, # 80787-6, November 4, 2010 (26 pages)

CERTIFICATION OF SERVICE

     I, Carol Farr, hereby certify that on November 18, 2010, I caused to be electronically filed this letter with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Defendants' attorney of record,  Thomas R. Knoll, Jr., at ThomasK@atg.wa.gov, and I have put a copy in the mail addressed to Robert McKenna, Office of the Washington Attorney General, Social & health Services, 7141 Cleanwater Dr. SW, PO Box 40124, Oympia WA 98504-0124.

November 18, 2010

_____/s/_____
Carol Farr, WSBA # 27470

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MICHAEL S. JONES, R.Ph., | ) | |
| | ) | |
| Petitioner, | ) | No. 80787-6 |
| | ) | |
| v. | ) | |
| | ) | EN BANC |
| STATE OF WASHINGTON and its | ) | |
| DEPARTMENT OF HEALTH; | ) | Filed November 4, 2010 |
| WASHINGTON STATE BOARD OF | ) | |
| PHARMACY; PHYLLIS WENE and | ) | |
| STAN JEPPESEN, individually and as | ) | |
| investigators for the Washington State | ) | |
| Board of Pharmacy; and DONALD | ) | |
| WILLIAMS, individually and as executive | ) | |
| director of the Board of Pharmacy, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

FAIRHURST, J. — Without giving him notice or an opportunity to be heard, the Washington State Board of Pharmacy (Board) summarily suspended Michael S. Jones' business and professional licenses to practice pharmacy due to unsatisfactory inspection reports. During the subsequent administrative proceeding, Jones agreed to the revocation of his pharmacy location license and a five-year suspension of his

*Jones v. State*, No. 80787-6

professional license. Jones now sues the State of Washington, the Department of Health (DOH), the Board, the Board's executive director, and two pharmacy inspectors, alleging that the suspension was based on an improper investigation and hearing. At issue is whether the Board's inspectors are entitled to qualified immunity from liability under 42 U.S.C. § 1983 for violations of Jones' right to due process. Also at issue is whether the exhaustion doctrine bars Jones' state tort claims because he waived two opportunities for administrative hearings. The Court of Appeals held that Jones' right to due process was not violated and that Jones failed to exhaust his administrative remedies. We reverse.

## I.    FACTUAL AND PROCEDURAL HISTORY[1]

The Board conducts "periodic inspections to determine compliance with the laws regulating the practice of pharmacy." WAC 246-869-190(1). Board inspectors assign the pharmacy a "'[c]lass A'" classification for an inspection score of 90 to 100; "'[c]onditional'" for 80 to 89; and "'[u]nsatisfactory'" for below 80.  WAC 246-869-190(3)(a)-(c). A pharmacy classified as unsatisfactory is "subject to disciplinary action" if the score does not increase to 90 or better within 14 days. WAC 246-869-190(5). A pharmacy's license is subject to summary suspension for

---

[1] Because this case comes to us on an order for summary judgment, we set forth the facts and the reasonable inferences from them in the light most favorable to the nonmoving party-- Jones. *Bishop v. Miche,* 137 Wn.2d 518, 523, 973 P.2d 465 (1999).

2

*Jones v. State*, No. 80787-6

an "unsatisfactory" classification if the pharmacy's conditions "represent a clear and present danger to the public health, safety, and welfare." WAC 246-869-190(8).

A.    Jones' pharmacy is inspected four times from December 1998 to August 1999, with fluctuating inspection scores

Jones first began practicing pharmacy in Washington in 1980. In 1995, he purchased a Medicine Shoppe pharmacy franchise in Marysville and served as its sole pharmacist. Board inspector Phyllis Wene conducted a routine inspection of Jones' pharmacy on December 17, 1998, and assigned an unsatisfactory score of 79. Nearly seven weeks later, on February 3, 1999, Wene reinspected and assigned a class A score of 94. Jones says the condition of his pharmacy got even better by the summer of 1999.

Despite this improvement in conditions, Wene and Board inspector Stan Jeppesen assigned an extremely low unsatisfactory score of 48 to Jones' pharmacy on July 12, 1999. At this inspection, Jones says he "was subjected to non-stop harassment by Wene and Jeppesen," and he lists many examples: "Jeppesen yelled at me and banged his hands on the pharmacy counter while I tried to select, count, and prepare medications"; "Wene and Jeppesen stood on either side of me and made repeated demands in rapid-fire succession"; and "Jeppesen stood directly behind me--within six inches--and interrupted me while I entered information on the

3

*Jones v. State*, No. 80787-6

computer system." Pl.'s Clerk's Papers (PCP) at 766. Jones reports a history of bad blood with the Board: In 1994, he confronted a Board inspector and told him to stop harassing his co-worker, and only three weeks after this incident, the Board placed Jones on probation for misfilling a prescription. On August 10, 1999, Wene and Jeppesen reinspected and assigned an unsatisfactory score of 56.

Jones alleges that "the scoring of the deficiencies was conducted in an arbitrary and capricious manner" and testified that "in numerous instances the inspector deducted five points (the <u>maximum</u> per deficiency) for minor discrepancies." PCP at 768. Further, Jones claims there were "numerous errors in each inspection report." *Id.* For instance, in December 1998, Wene cited Jones for "[v]arious . . . records required by state and federal law were either inaccurate, incomplete or not available." Def.'s Clerk's Papers (DCP) at 416.[2] In February 1999, she again cited Jones for violations relating to "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. In July and August, Jones was cited for violating WAC 246-887-020, which requires a pharmacist who fills prescriptions for controlled substances to comply with federal regulations for inventory control. However, Jones declares that by July, "I did have the required

---

[2]Unfortunately, the inspection reports from December 1998 and February 1999 were not included in the appellate record. However, the stipulated findings of fact from Jones' agreed order with the Board contains a summary of their findings. Our quotations related to these first two reports are from the stipulations.

*Jones v. State*, No. 80787-6

DEA [(Drug Enforcement Administration)] order forms and invoices but I kept them in different places." PCP at 767. And in August, he says, "I had matched DEA order forms with invoices" and "I did perform the inventory for Schedule II and Schedule III drugs prior to the second inspection." PCP at 767-68. In a declaration to the Board, Jones admitted some minor record-keeping problems, but the July and August reports do not explain what was different from the prior two inspections.

In December 1998, Wene cited Jones for "[d]ispensing the majority of prescriptions in non child-resistant containers without a written request from either the patient or the prescriber." DCP at 416. In February 1999, Jones might have committed this infraction--the record is not clear--because Wene cited Jones for "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. Jones was definitely cited for the same violation in July and August. PCP at 651-52. The inspectors were able to identify only a small percentage of the necessary signatures, and Jeppesen described Jones' signature-tracking system as disorganized. However, Jones declares, "I did have written records of patients' requests for non-child resistant caps." PCP at 767. He further stated, "It was also my understanding that Mrs. Wene approved of my system when I received a 94 on February 3, 1999. That was the same system that was in place in July and August." DCP at 342.

*Jones v. State*, No. 80787-6

In December 1998, Wene cited Jones for "[f]ailing to obtain chronic conditions on patients of the pharmacy." DCP at 416. In February 1999, again, Jones might have been guilty of the same; the record discloses only that Wene cited Jones for "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. Jones received the maximum penalty of minus five points in July and August 1999 for failing to track information on patient allergies and chronic conditions and for failing to keep the required audit trail of orders and order modifications. *See* ch. 246-875 WAC. Jones insists that he "did enter allergy and chronic disease information about customers into my computer record," but he acknowledges that "unbeknownst to me the QS-1 computer system was recording the information but not processing it." PCP at 767. He says that during the August inspection, he discovered the error when he called the computer system vendor, and he had the vendor correct the error at that time. DCP at 341. The record does not disclose why his latter violations, which stemmed from a computer malfunction, were worse than any violations during the first two inspections.

In December 1998, Jones lost points (as with all the cited infractions from this date, we do not know how many points) because "[m]any of the prescriptions in the will call area had labeled expiration dates exceeding the manufacturer's expiration date." DCP at 416; *see* WAC 246-869-150. In July 1999, Jones received

6

*Jones v. State*, No. 80787-6

a 15 point deduction for having 24 or more items in stock past their expiration date. PCP at 651. Jones admitted in a declaration to the Board that he had some outdated products, but he says he "did <u>not</u> have 38 outdated items," and he insists, "I had a regular process for checking outdated medications." DCP at 214. In August 1999, Jones received a deduction of five points for 11 outdated items. However, Jones says that by August, "I did not have outdated medications on the shelf." DCP at 214. At the least, Jones claims he did not have as many outdated items as the inspectors assert, and it is not clear why Jones was penalized severely for the same infraction he committed in December 1998.

In December 1998, Jones was cited because "[m]ost of the prescriptions in the will call area contained the incorrect NDC [(National Drug Code)] number for the product in the prescription container." DCP at 416. In July and August 1999, Jones was again cited for this violation, and he received the maximum deduction of five points. He admits that some medications on his shelves did not match their respective container's NDC number. But he says, "I never substituted a drug that had been prescribed by a doctor," PCP at 767, and the record again does not explain the difference between the assessments over time.

Jones also received deductions for improper record-keeping of prescription files--four points in July and five points in August. But again, in both the earlier

7

*Jones v. State*, No. 80787-6

December 1998 and February 1999 inspections, Jones was cited for failing to keep his records in accordance with state law, and the record does not explain whether the July and August violations were materially different. Jones also received deductions for improper prescription labels--a total of three points in July and ten points in August. The record is not clear whether these deductions were separate deductions for the same alleged NDC labeling problems. Finally, in July, Jones received deductions of two points for keeping an outdated reference source and four points for his pharmacy assistant not wearing a name badge or signing a proper certification, and one point for keeping dirty dishes in a sink. By August, apparently these violations were cured.

B.    Without giving Jones prior notice or a hearing, the Board suspends his licenses and orders his pharmacy closed

On August 16, 1999, the executive director of the Board, Donald Williams, filed an ex parte motion for summary action to immediately suspend Jones' licenses and close his pharmacy. On August 17, 1999, without a hearing involving Jones, the Board granted Williams' motion after finding Jones' conduct "placed the patients of his pharmacy at serious risk of significant harm." DCP at 323. Later that day, Wene served Jones with a copy of the Board's order and a notice explaining that Jones had the right to request a "prompt" hearing to be held three and a half weeks later,

8

*Jones v. State*, No. 80787-6

on September 10, 1999, or instead a "regularly scheduled" hearing. DCP at 329.

The notice further explained that Jones would waive his right to the September 10,

1999 hearing if he chose to file a written motion challenging the summary action.[3]

C.    Jones utilizes the administrative process to challenge the summary
      suspensions; Jones loses his business

On August 30, 1999, Jones filed a written motion to modify the Board's

ruling and stay the summary suspension of his licenses and thereby waived the

September hearing. In a supporting declaration, Jones said, "The suspensions put

me in a horrible financial bind." PCP at 770. On August 31, 1999, The Medicine

Shoppe International terminated Jones' franchise. On September 7, 1999, a three-

person Board panel denied Jones' motion. On September 13, 1999, Jones petitioned

the Board for an expedited hearing. DOH objected to Jones' request to set the

hearing outside of the Board's regular schedule, and a hearing was set for October

21, 1999. On October 18, 1999, DOH moved for a continuance, and the hearing

was reset for December 7, 1999.

Having lost his business and the financial resources to pay for his defense,

Jones did not go through with the hearing. He decided to negotiate a settlement that

would prevent the permanent revocation of his professional license. On January 11,

---

[3]RCW 18.130.050(8) has since been amended to require the Board to hold a show cause
hearing "[w]ithin fourteen days of a request by the affected license holder." Laws of 2008, ch.
134, § 3. At the time, however, the statute included no such requirement.

9

*Jones v. State*, No. 80787-6

2000, Jones signed stipulated findings of fact and conclusions of law, as well as an agreed order revoking his license for the pharmacy and suspending his pharmacist license for five years. In the stipulations, he "acknowledge[d] that the evidence is sufficient to justify the . . . findings," DCP at 415, and he waived his right to a full adjudicative hearing. He did not waive his right to sue. The Board accepted and entered the order on February 4, 2000.

D.    Jones brings suit

In 2002, Jones filed suit against the State, DOH, the Board, Williams, and Wene and Jeppesen. The trial court granted partial summary judgment, leaving three of Jones' claims: (1) violation of due process (42 U.S.C. § 1983) against Wene, Jeppesen, and Williams in their individual capacities; (2) negligent supervision against all defendants; and (3) tortious interference with a business expectancy against all defendants.

The Court of Appeals reversed the trial court's denial of summary judgment on Jones' remaining claims, holding that Williams was entitled to absolute immunity, that Jones' right to due process was not violated, and that Jones' tort claims were barred by his failure to exhaust administrative remedies. *Jones v. State*, 140 Wn. App. 476, 166 P.3d 1219 (2007).

We granted Jones' petition for review. *Jones v. State*, 164 Wn.2d 1019, 195

10

*Jones v. State*, No. 80787-6

P.3d 89 (2008). Jones does not challenge the Court of Appeals' holding that Williams is absolutely immune from Jones' claims.

## II.    ANALYSIS

A.    Whether Wene and Jeppesen are entitled to qualified immunity from liability under § 1983 for violating Jones' right to due process

When the defendant moves for summary judgment in a § 1983 suit and raises a qualified immunity defense, the court has two questions before it. One is whether the plaintiff's allegations establish a connection between the defendant's conduct and the violation of a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). There must be "a genuine issue as to whether the defendant in fact committed those acts." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).    The second question is whether the defendant's conduct was objectively reasonable in light of clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The court may answer these questions in whichever "order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009). These are both "essentially legal question[s]" for the court to decide. *Mitchell*, 472 U.S. at 526. We employ de novo review of legal questions decided on

11

*Jones v. State*, No. 80787-6

summary judgment. CR 56(c); *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d
589, 595, 70 P.3d 954 (2003).

*Jones v. State*, No. 80787-6

    1.    *The procedural due process right at issue*

To answer either of these questions, we find it necessary to start with an analysis of the constitutional right at issue. *See Pearson*, 129 S. Ct. at 818 ("'[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be.'" (alteration in original) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring))). The Fourteenth Amendment grants the right to due process of law to a person facing a deprivation of his or her property by the state. The State[4] argues that where a state official's conduct is limited to producing an investigative report, the official does not deprive anyone of property. The State believes that the responsibility for providing adequate procedures rests only with the state officials who make the subsequent decision to suspend or revoke the license. From these premises, the State argues that no procedural due process right is at issue. Because the decision to deprive Jones of his licenses rested with Williams and the Board, Wene and Jeppesen cannot be liable for any due process violation that occurred. We disagree.

In the criminal law context, the deprivation of liberty based on fabricated evidence is a violation of a person's constitutional right to due process. *See, e.g.*,

---

[4]We use "State" to refer to the remaining defendants collectively.

*Jones v. State*, No. 80787-6

*Miller v. Pate*, 386 U.S. 1, 7, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) (noting that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"); *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (holding that there is a "constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer"); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) (describing the fundamental concept "that those charged with upholding the law are prohibited from deliberately fabricating evidence"); *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000) (holding "that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity"). We conclude that this due process right applies with equal force in a civil proceeding, such as the administrative adjudication in this case, because a pharmacist's professional and business licenses are property interests protected by the due process clause. *Cf. Ongom v. Dep't of Health*, 159 Wn.2d 132, 139, 148 P.3d 1029 (2006) (holding that a nurse, as with a medical doctor, has a protected property interest in a professional license).

Of course, the state is generally excused from providing a license holder with prior notice and a hearing if an emergency justifies summary action. *See, e.g., Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299-300, 101 S. Ct.

14

*Jones v. State*, No. 80787-6

2352, 69 L. Ed. 2d 1 (1981); *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 319-20, 29 S. Ct. 101, 53 L. Ed. 195 (1908). Still, we do not think the emergency can be fabricated. The procedural due process right is not to be free of the fabrication itself, but rather to be free from the subsequent deprivation of property based on the false evidence. *See Zahrey*, 221 F.3d at 348-49. When a summary procedure is based on a fabricated emergency, the procedure is inherently defective. Thus, while an investigator might not initiate or decide the outcome of the proceeding, the inspector still can cause the violation of a procedural due process right. As long as a sufficient causal connection is established between the defendant official's conduct and the violation, a § 1983 plaintiff does not have to prove that the defendant official personally violated the plaintiff's right. Under § 1983, "[e]very person who, under color of any statute . . . subjects, *or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." (Emphasis added.)

The causation element of § 1983 is met if the plaintiff shows the defendant official "'set[] in motion a series of acts by others which the [official] knows or reasonably should know would cause others to inflict the constitutional injury.'" *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987) (quoting *Johnson v. Duffy*,

15

588 F.2d 740, 743-44 (9th Cir. 1978)).[5]

We agree with the State that Jones has not presented evidence that Wene and Jeppesen conspired with Williams and the Board to deprive Jones of his licenses without due process. However, as the foregoing discussion makes clear, Wene and Jeppesen are liable under § 1983 if they wrongfully fabricated an emergency and knew or reasonably should have known that this fabrication would cause Williams and the Board to find an emergency and summarily suspend Jones' license without a predeprivation hearing.[6] The question on summary judgment is whether enough evidence in the record establishes a genuine issue of material fact.

2.    *Genuine issue of material fact exists over whether Wene and Jeppesen's conduct caused a violation of Jones' constitutional right*

---

[5]When an independent decision maker intervenes between the first wrongful act and the ultimate deprivation of the constitutional right, as in this case, the chain of causation is not broken "where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty" or property. *Zahrey*, 221 F.3d at 352; *see also Wilmore*, 407 F.3d at 283 (holding an investigating officer is liable under § 1983 for the "reasonably foreseeable result of [the] initial act of fabrication"). However, as the Second Circuit notes, "[t]he initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, 'but for' causation could be claimed to be lacking." *Zahrey*, 221 F.3d at 352 n.8.

[6]The dissent incorrectly states the issue as "whether the inspectors fabricated evidence of the violations they found." Dissent at 22. Jones does not argue that all evidence of violations was fabricated, and the record would not support such a claim. In fact, Jones concedes that the later agreed order complied with due process: "Jones's § 1983 claim is not based on the fact that the Board of Pharmacy ultimately suspended his licenses; Jones's § 1983 claim is based on the fact that his licenses were suspended ex parte -- without notice and an opportunity to be heard." Pet. for Review at 11. Thus Jones' § 1983 claim against Wene and Jeppesen centers on their role in fabricating an emergency. If Williams and the Board had provided predeprivation procedures to Jones, this could have been a different case.

*Jones v. State*, No. 80787-6

Because this case is before us for a review of a ruling on a motion for summary judgment, we must review the facts and the reasonable inferences from them in the light most favorable to Jones as the nonmoving party. *Bishop v. Miche,* 137 Wn.2d 518, 523, 973 P.2d 465 (1999). A genuine issue of material fact exists if, after weighing the evidence, reasonable minds could reach different factual conclusions about an issue that is material to the disputed claim. *See Hartley v. State,* 103 Wn.2d 768, 775, 698 P.2d 77 (1985). We conclude there is a genuine issue of material fact; a reasonable juror could infer Wene and Jeppesen arbitrarily lowered Jones' inspection scores in order to fabricate an emergency that would induce the Board to shut down Jones' pharmacy. This is a very close case, but the key facts are Wene's December 1998 investigation and the passing score that Wene gave in February 1999.

For instance, at the December 1998 inspection, Wene found the same sort of violations that she and Jeppesen later said were worthy of scores of 48 and 56 in July and August, respectively. In December 1998, Jones was failing to get information on patients' chronic conditions, using nonchild-resistant containers, keeping medications past their expiration date, filling prescriptions with medications that did not match the containers' NDC numbers, and "records required by state and federal law were either inaccurate, incomplete or not available." DCP at 416. As far

17

*Jones v. State*, No. 80787-6

as a reasonable juror could conclude, this last statement meant problems with prescription files and DEA record-keeping. Despite these violations, Wene gave Jones a score of 79 in December 1998, not the dramatically failing scores he received later. The State does not present evidence of the violations in February 1999 that merited deductions of six points, for an overall passing score of 94. We know only that Jones' violations related to "inaccurate, incomplete or missing records required by state or federal law," DCP at 416-17, which could mean Jones committed a host of violations in February 1999 without receiving harsh scoring, such as improper DEA record-keeping, failure to track patients' chronic conditions, and disorganized prescription records. By summer, Jones' pharmacy was in better condition, but Wene and Jeppesen changed the assessment from a 94 to badly failing scores in July and August 1999.

Like the first two inspections, the July and August 1999 inspection reports certainly suggest that some violations were occurring. Jones admits as much, although he denies some of the violations--or at least disagrees with the severity that Wene and Jeppesen claimed. The only apparent material difference between these inspections and the first two is the level of detail in describing Jones' violations. What clearly changed was the assessment and scoring of Jones' pharmacy. Notably, the record indicates that in each of the four inspections, Wene or Jeppesen found

18

*Jones v. State*, No. 80787-6

violations relating to state and federal laws regarding record-keeping. And the Board cited "the condition of the pharmacy, *especially* the violations related to record-keeping," as the reason for why a summary suspension was necessary. DCP at 323 (emphasis added). Inexplicably, however, the record does not disclose why the Board's inspectors chose suddenly in July 1999 to start scoring Jones severely for these record-keeping violations.

That Wene and Jeppesen fabricated an emergency that would justify a summary suspension is a conclusion that a reasonable juror might reach from (1) the radical change in scoring over time, (2) the lack of apparent reasons for the change, (3) Jones' insistence that many of the violations were not as bad as the inspection reports claimed, and (4) the inspectors' aggressive behavior at Jones' pharmacy. Further, a reasonable juror could find that Wene and Jeppesen knew, or should have known, that Williams would seek, and the Board would grant, an order summarily suspending Jones' licenses on the basis of the fabricated emergency. The Board would have been derelict had it ignored such unsatisfactory scores, and it had the authority to summarily suspend Jones' licenses. WAC 246-869-190(8); WAC 246-11-300(1)(a), (c). Our view of Wene and Jeppesen's conduct might have been different if the State had adduced irrefutable evidence that 48 and 56 were scores typical for the violations found or that the condition of Jones' pharmacy was in fact

19

*Jones v. State*, No. 80787-6

far better in February 1999 than it was in July and August 1999. As this case is

presented to us, however, a jury might reasonably credit Jones' version of events.[7]

### 3.    *Qualified immunity*

Under the doctrine of qualified immunity, "[g]overnment officials performing

discretionary functions" are immune from § 1983 suits "if their conduct is

objectively reasonable when measured against clearly established law." *Robinson v.*

*City of Seattle*, 119 Wn.2d 34, 64-65, 830 P.2d 318 (1992). For a constitutional

right to be clearly established, "[t]he contours of the right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right."

---

[7]In the stipulated findings of fact, conclusions of law, and agreed order, Jones "acknowledge[d] that the evidence is sufficient to justify" the findings for which his license was suspended. PCP at 415. But he expressly did not "admit to the . . . conduct." *Id.* If the stipulations had been drafted differently such that he admitted to the violations and their sufficiency as a basis for suspending his licenses, then this case might be dramatically different.

The dissent dismisses Jones' declaration as "self-serving" and containing "conclusory statements of ultimate fact." Dissent at 22. However, the rule is settled that "[t]he court does not weigh credibility in deciding a motion for summary judgment." 14A Karl B. Tegland, Washington Practice: Civil Procedure § 25:16 (2009). Thus, a court must not weigh the veracity of a declaration simply because it is "self-serving." The dissent's analysis would usurp the role of the jury, and plaintiffs whose claims depend on their own version of events would no longer be able to rely on their own declarations. Plaintiffs would be unable to withstand motions for summary judgment, because their declarations would be disregarded as "self-serving."

The dissent also argues that Jones' declaration contains only conclusory statements and therefore does not present evidence about the condition of his pharmacy in February 1999 or that the inspectors' point deductions were for minor discrepancies. *See* dissent at 11-12. The dissent misstates the meaning of a conclusory statement or ultimate fact. For example, the statement "Wene and Jeppesen violated my right to due process" is a conclusion. *Cf. Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 360-61, 753 P.2d 517 (1988) (holding that a plaintiff's bare allegation of age discrimination was a conclusion). The statement that Jones' pharmacy was in better condition in July than in February is not conclusory. It is a specific fact. The dissent cannot apply the label "conclusory" to every fact that it finds inconvenient.

20

*Jones v. State*, No. 80787-6

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). It is not necessary that a court have previously held the official's conduct is unconstitutional; rather, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* We hold that Wene and Jeppesen are not entitled to qualified immunity.

Several cases define the contours of the due process right at issue. To be sure, an official's assessment of an emergency is given judicial deference because "[t]he law should not discourage officials from taking prompt action to insure the public safety." *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999). However, the Second Circuit has recognized that "abusive and arbitrary" assessments of an emergency cannot justify deprivations without prior notice or a hearing. *Id.* Further, the Ninth Circuit stated in *Armendariz v. Penman*, 31 F.3d 860 (9th Cir. 1994), *vacated in part on other grounds*, 75 F.3d 1311 (9th Cir. 1996), that an emergency is impermissibly fabricated when an official knows an emergency does not exist but persists with declaring an emergency. *Id.* at 866. Finally, the First Circuit has observed, "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals." *Limone*, 372 F.3d at 44-45. In light of these admonitions, it would have been apparent to a reasonable official that Wene

21

*Jones v. State*, No. 80787-6

and Jeppesen were prohibited from knowingly and arbitrarily changing Jones' inspection scores and thus fabricating a sense of emergency.

*Jones v. State*, No. 80787-6

B.    Whether the exhaustion doctrine bars Jones' state tort claims because he
waived two opportunities for administrative hearings

A party is required to exhaust available administrative remedies prior to

bringing a claim in court when (1) the claim is cognizable in the first instance by an

agency alone, (2) the agency has clearly established mechanisms for resolving

complaints by aggrieved parties, and (3) the administrative remedies can provide the

relief sought by the party. *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 808, 991

P.2d 1135 (2000); *Retail Store Employees Union, Local 1001 v. Wash. Surveying

& Rating Bureau*, 87 Wn.2d 887, 907, 558 P.2d 215 (1976). Even if this doctrine

required Jones to exhaust his tort claims--an issue we do not decide here--his claims

would not be barred because Jones exhausted the administrative remedies available.

A party exhausts administrative remedies when there is a final agency

determination. *See Rains v. Dep't of Fisheries*, 89 Wn.2d 740, 744, 575 P.2d 1057

(1978). A final determination arises out of a final agency action. Charles H. Koch,

Jr., Administrative Law and Practice § 13.20, at 335 (2d ed. 1997). A final agency

action "implies a definitive act of the agency, action which is binding until and

unless it is set aside by a court." *Id.* Here, the agreed order was a final agency

determination binding on all parties. Jones exhausted the administrative remedies.

Although Jones waived his right under WAC 246-11-330 to request a

23

*Jones v. State*, No. 80787-6

"prompt" hearing after the summary suspension, this waiver does not change the fact that the Board reached a final determination, and thus Jones exhausted administrative remedies. The exhaustion doctrine does not mean that a person subject to an adverse agency action must take advantage of the most expeditious review procedures available. The exhaustion doctrine's purpose is not to force the quickest resolution possible or to second-guess the aggrieved party's strategic choices. To conclude otherwise would encourage agencies to rush aggrieved parties without giving them the chance to fully prepare a defense. If an aggrieved party waived the expedited hearing, the agency could then prolong the proceedings, as the Board did here (it rejected Jones' request to hold an immediate hearing after he filed his motion to modify and for a stay, and then it continued the regularly scheduled hearing over Jones' objection) in hopes of forcing a settlement.  That cannot be right. As long as an aggrieved party takes one of the available procedural paths toward a final agency determination, as Jones did here, there is no failure to exhaust.

By accepting and entering the stipulations and agreed order, the Board ended the administrative process. It is true that the Board never had an adjudicative hearing because Jones waived his right to a regularly scheduled hearing as part of the agreed order. However, as the State itself notes, the Board had the discretion to reject the agreed order. Exhaustion is necessary to give the agency a complete

24

opportunity to review the aggrieved party's claim. The Board had its opportunity and decided to enter the agreed order; there was nothing left for Jones to exhaust.[8]

## IV.   CONCLUSION

We reverse the Court of Appeals' holding that pharmacy inspectors Wene and Jeppesen are not subject to Jones' § 1983 claim. There is a genuine issue of material fact concerning whether they caused a violation of Jones' due process right to be free from summary proceedings based on a fabricated emergency. Wene and Jeppesen's conduct, when viewed favorably to Jones as the party opposing summary judgment, was unreasonable in light of clearly established law. We also reverse the Court of Appeals' holding that Jones failed to exhaust the available administrative remedies, and we leave for another day the question whether a plaintiff, such as Jones, was required to exhaust administrative remedies.

---

[8]The State and dissent go beyond the exhaustion issue presented for our review and argue that the administrative process severed the causal connection between the actions of Wene and Jeppesen and Jones' injuries. The State, citing *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 88, 1 P.3d 1148 (2000), argues in its supplemental brief that the Board's independent decisions to summarily suspend Jones' licenses and then enter the agreed order broke the chain of causation. The State and the dissent further argue, based on *City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997), that Jones' actions during the administrative process prevent him from establishing legal causation. Critically, however, the Court of Appeals did not consider causation, and neither Jones' petition for review nor the State's answer addressed it. The scope of our review is limited, and we choose not to address causation because it was raised for the first time in the State's supplemental brief and in the dissent. *See* RAP 13.7(b).

25

*Jones v. State*, No. 80787-6

AUTHOR:
　　Justice Mary E. Fairhurst

WE CONCUR:

　　Justice Charles W. Johnson

　　Justice Richard B. Sanders　　Justice Debra L. Stephens

　　Justice Tom Chambers

26